**DeNITTIS OSEFCHEN PRINCE, P.C.**
STEPHEN P. DeNITTIS, Esq. (SD-0016)
5 Greentree Centre
525 Route 73 North, Suite 410
Marlton, NJ 08053
Telephone: 856-797-9951
Fax: 856-797-9978
sdenittis@denittislaw.com

Attorneys for Plaintiff and the [Proposed] Class
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CANDACE KIMMEL, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| FISHER-PRICE, INC., and MATTEL, INC., | |
| Defendants. | |

Plaintiff Candace Kimmel ("Plaintiff") brings this action against defendants

Fisher-Price, Inc. ("Fisher-Price") and Mattel, Inc. ("Mattel" and, together with

Fisher-Price, "Defendants") on behalf of herself and all others similarly situated who purchased Fisher-Price Rock 'n Play Sleepers, and alleges as follows:

## NATURE OF THE ACTION

1.      The Fisher-Price Rock 'n Play Sleeper ("Rock 'n Play Sleeper") is an inclined infant "sleeper" that Defendants market as suitable for all night and prolonged sleep.  However, as Defendants were recently forced to admit, the Rock 'n Play Sleeper has caused at least ten infant deaths since 2015, and, because infant "deaths continue to occur," the Consumer Product Safety Commission ("CPSC") "is recommending consumers stop use of the product by three months of age, or as an infant exhibits rollover capabilities."[1] As described below, as infant sleep experts uniformly agree, the Rock 'n Play Sleeper is inherently dangerous and unfit for use as a sleeper, because the way the Rock 'n Play Sleeper positions the baby increases the risk of suffocation.  Further, the use of the Rock 'n Play Sleeper can result in babies developing "flat head" and "twisted neck" conditions, requiring costly treatment.

2.      Defendants have known about these risks for as long as they have sold the Rock 'n Play Sleeper.  Among other things, the American Academy of Pediatrics ("AAP") and other infant sleep experts have repeatedly issued warnings about the

---

[1] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product# (last visited April 10, 2019).

dangers of inclined sleepers, including the Rock 'n Play Sleeper. Further, in 2011, the Canadian and Australian governments refused to allow Defendants to sell the Rock 'n Play Sleeper as a "sleeper" due to its dangers.  Defendants have also been sued in connection with infant deaths in the Rock 'n Play Sleeper. Nonetheless, Defendants kept on marketing the Rock 'n Play Sleeper as a sleeper in the United States, unconscionably exposing their customers' babies to the known risk of death and injury.

3.     As stated above, on April 5, 2019, the CPSC and Fisher-Price issued a joint news release acknowledging that ten infants have died while in the Rock 'n Play Sleeper since 2015, and warning consumers to stop using the Rock 'n Play Sleeper once the infant reaches three months of age or as soon as the infant exhibits rollover capabilities.[2]  The news release stated, in relevant part:

> The Consumer Product Safety Commission (CPSC) and Fisher-Price warn consumers about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product.  According to medical literature, infants typically begin rollover behaviors at 3 months.  The CPSC is aware of 10 infant deaths in the Rock 'n Play that have occurred since 2015, after the infants rolled from their back to their stomach or side, while unrestrained.  All 10 infants were 3 months or older.

> Because deaths continue to occur, CPSC is recommending consumers stop use of the product by three months of age, or as soon as an infant

---

[2] https://cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last visited April 10, 2019).

exhibits rollover capabilities. CPSC has previously warned consumers to use restraints in infant inclined sleep products.

Fisher-Price warns consumers to stop using the product when infants can roll over, but the reported deaths show that some consumers are still using the product when infants are capable of rolling and without using the three point harness restraint.

CPSC and Fisher-Price remind consumers to create a safe sleep environment for infants, whether using a crib, bassinet, play yard, or inclined sleeper: Never add blankets, pillows, stuffed toys, or other items to the environment and always place infants to sleep on their backs.

The Commission voted to publish a finding that the health and safety of the public requires immediate notice.

4.      Mattel issued a press release later in the day on April 5, 2019,[3] shortly after the joint CPSC/Fisher-Price announcement, which stated in relevant part (emphasis added):

A child fatality is an unimaginable tragedy.

Fisher-Price has a long, proud tradition of **prioritizing safety as the cornerstone of our mission**. Generations of parents have trusted us for almost 90 years to provide safe products for their children. We are there with you from the moment you bring your child home and take our responsibility for product safety very seriously.

Today, the Consumer Product Safety Commission (CPSC) and Fisher-Price have jointly issued an alert warning parents and caregivers to discontinue use of the Rock 'n Play Sleeper when infants begin to roll over. **To ensure a safe sleep environment for infants, we remind parents and caregivers to follow all safety warnings included with**

---

[3] https://news.mattel.com/news/media-statement-on-the-u-s-consumer-product-safety-commission-fisher-priceR-joint-security-alert-released-on-april-5-2019 (last visited April 10, 2019).

4

**the product: always use the provided restraints, always place infants on their backs to sleep, and make sure that no pillows, blankets or extra padding are placed in the Rock 'n Play Sleeper. The Rock 'n Play Sleeper meets all applicable safety standards,** including those of the international standards organization, known as ASTM International, and is certified by the Juvenile Products Manufacturers Association (JPMA).

Fisher-Price and every one of our employees take the responsibility of being part of your family seriously, and we are committed to earning that trust every day.

5.     Despite announcing that at least ten babies died from the use of Defendants' product and issuing a warning to consumers, Chuck Scothon, general manager of Fisher-Price, issued a statement on April 5, 2019, stating that the Rock 'n Play Sleeper meets all applicable safety standards.[4]

6.     On April 8, 2019, Consumer Reports published a lengthy article entitled *Fisher-Price Rock 'n Play Sleeper Should be Recalled, Consumer Reports Says.*[5] The article describes the results of Consumer Reports' investigation, which found the Rock 'n Play Sleeper is tied to at least 32 infant deaths. Consumer Reports noted that the Rock 'n Play Sleeper "has not been recalled by Fisher-Price, part of the children's products giant Mattel, which had about $4.5 billion in sales in 2018. The deaths prompted only warnings by the company and the CPSC, which does not have

---

[4] https://www.cnn.com/2019/04/05/health/fisher-price-rock-n-play-sleeper-warning/index.html (last visited April 10, 2019).

[5] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last accessed April 10, 2019).

a mandatory safety standard for infant reclined sleep products." The article further notes that "the number of incidents associated with the Rock 'n Play Sleeper, combined with long-standing expert medical advice that babies should sleep on firm, flat surfaces, raises serious safety concerns about the product."

7.   On April 9, 2019, the AAP issued a press release calling on the CPSC to recall the Rock 'n Play Sleeper and urging parents to stop using the Rock 'n Play Sleepers immediately, stating in relevant part as follows (emphasis added):[6]

> AAP urges parents to stop using the product immediately. Stores should remove the Rock 'n Play Sleeper from their shelves. A warning issued by the CPSC and Fisher-Price on April 5 did not go far enough to ensure safety and protect infants, according to the AAP.
>
> "This product is deadly and should be recalled immediately," said Kyle Yasuda, MD, FAAP, president of the American Academy of Pediatrics. "When parents purchase a product for their baby or child, many assume that if it's being sold in a store, it must be safe to use. Tragically, that is not the case. There is convincing evidence that the Rock 'n Play inclined sleeper puts infants' lives at risk, and CPSC must step up and take immediate action to remove it from stores and prevent further tragedies."
>
> Last week, the CPSC and manufacturer alerted consumers to stop using the product when the infant reaches 3 months of age or is capable of rolling over, citing 10 infant deaths that occurred in the Rock 'n Play. The Consumer Reports article, published April 8, tied a total of 32 deaths to the Rock 'n Play, including the 10 noted in last week's warning.

---

[6] https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Urges-U-S-Consumer-Product-Safety-Commission-to-Recall-Fisher-Price-Rock-n-Play-Sleeper.aspx (last visited April 10, 2019).

Consumer Reports concluded that these 32 deaths, between 2011 and 2018, included babies even younger than the 3-month threshold cited in the initial warning, which is alarming. The cause of death listed for some babies was asphyxia, or the inability to breathe caused by the babies' position. **AAP urges parents of children of all ages to immediately stop using the Rock 'n Play.**

"We cannot put any more children's lives at risk by keeping these dangerous products on the shelves," said Rachel Moon, MD, FAAP, chair of the AAP Task Force on SIDS. "The Rock 'n Play inclined sleeper should be removed from the market immediately. It does not meet the AAP's recommendations for a safe sleep environment for any baby. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding."

The AAP does not recommend inclined sleep products like the Rock 'n Play, or any other products for sleep that require restraining a baby.

8.      Had Plaintiff and the other members of the Class (defined below) been aware of the potentially fatal dangers and other risks posed by Defendants' Rock 'n Play Sleeper, they would not have purchased them or paid for them as much as they did.

9.      Plaintiff brings this action on behalf of herself and all other persons who purchased the Fisher-Price Rock 'n Play Sleeper between January 1, 2009 to the present, seeking redress under New Jersey and federal law.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) ("CAFA") because there are 100 or more class members; at least one

class member is a citizen of a state that is diverse from each Defendant's citizenship; and the amount in controversy exceeds $5 million exclusive of interest and costs.

11.     Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under the Magnuson Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, arise under federal law, and this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

12.     The Court has personal jurisdiction over Defendant Fisher-Price because it has purposefully availed itself of the privilege of conducting business in the State of New Jersey.

13.     The Court has personal jurisdiction over Defendant Mattel because it has purposefully availed itself of the privilege of conducting business in the State of New Jersey.

14.     Venue is proper in this district under 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action, including Plaintiff's purchase of her Rock 'n Play Sleeper, occurred in this District.

## **PARTIES**

15.     Plaintiff Candace Kimmel is a resident of Mercer County, New Jersey. She purchased a Rock 'n Play Sleeper for her infant daughter in in about September 2017.

8

16.     Defendant Fisher-Price, Inc. is a Delaware corporation with its principal place of business in Erie County, New York.  Defendant Fisher-Price manufactures and markets products for infants and preschool children to consumers throughout the United States, including in the state of New Jersey.

17.     Defendant Mattel, Inc. is a Delaware corporation with its principal place of business in El Segundo, California. Fisher-Price is a wholly owned subsidiary of Defendant Mattel, Inc.  Mattel manufactures and markets products for infants and children throughout the United States, including in the state of New Jersey.

## FACTS

### The American Academy of Pediatrics Recommendations

18.     Defendants introduced the Rock 'n Play Sleeper to the U.S. Market in 2009.  The Rock 'n Play Sleeper has a collapsible frame which supports a fabric hammock with tall sides, forcing the infant into a reclined position. The different models of the product share this same basic design. The Rock 'n Play Sleeper is extremely popular with parents of infants, because the product can also be used to rock the baby and lulling it to sleep.

19.     In 1992, the American Academy of Pediatrics ("AAP") released its recommendation that babies should be placed on their backs to sleep.  Subsequently,

while deaths from sudden infant death syndrome (SIDS) decreased, infant deaths from other causes including suffocation, entrapment and asphyxia did not.[7]

20.    In November 2005, the AAP issued a Policy Statement – *The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment, and New Variables to Consider in Reducing Risk* – expanding the guidelines and recommendations on safe sleep for babies.[8]  The recommendations included:

- "Back to sleep: Infants should be placed for sleep in a supine position (wholly on the back) for every sleep."

- Use a firm sleep surface: Soft materials or objects…should not be placed under a sleeping infant.  A firm crib mattress, covered by a sheet, is the recommended sleeping surface."

21.    In October 2011, the AAP issued an updated Policy Statement – *SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment* – further expanding the guidelines and recommendations on safe sleep for babies.[9]  The recommendations included:

- Infants should be placed "back to sleep for every sleep" in the supine position, wholly on his or her back.  The AAP noted that "[t]he supine sleeping position does not increase the risk of choking and aspiration in infants, even those with gastro-esophageal reflux."

---

[7] https://www.aap.org/en-us/about-the-aap/aap-press-room/pages/AAP-Expands-Guidelines-for-Infant-Sleep-Safety-and-SIDS-Risk-Reduction.aspx (last visited April 10, 2019).

[8] http://pediatrics.aappublications.org/content/116/5/1245 (last visited April 10, 2019).

[9] https://pediatrics.aappublications.org/content/128/5/1030 (last visited April 10, 2019).

- "Elevating the head of the infant's crib while the infant is supine is not recommended" because "it might result in the infant sliding…into a position that might compromise respiration."

- "Use a firm sleep surface – A firm crib mattress covered by a fitted sheet, is the recommended sleeping surface to reduce the risk of SIDS and suffocation."

- "Soft materials…should not be placed under a sleeping infant."

- "Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep."

- "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is practical."

- "Avoid commercial devices" like "wedges, positioners, special mattresses and special sleep surfaces. There is no evidence…that they are safe."

22.     In November 2016, the AAP issued a further updated Policy Statement – *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment* – reaffirming and further developing the guidelines and recommendations on safe sleep for babies.[10]  The recommendations included:

- "Recommendations for a safe sleep environment include supine positioning, the use of a firm sleep surface…and the avoidance of soft bedding[.]"

---

[10] https://pediatrics.aappublications.org/content/138/5/e20162938 (last visited April 10, 2019).

- "[M]anufacturers should follow safe sleep guidelines in their messaging and advertising."

- "Avoid the use of commercial devices that are inconsistent with safe sleep recommendations."

- Infants "should be placed for sleep in a supine position (wholly on the back) for every sleep by every caregiver until the child reaches 1 year of age…. The supine position does not increase the risk of choking and aspiration in infants, even those with gastroesophageal reflux."

- "Elevating the head of the infant's crib is ineffective in reducing gastroesophageal reflux and is not recommended; in addition, elevating the head of the crib may result in the infant sliding to the foot of the crib into a position that may compromise respiration."

- "[T]he best evidence suggests that infants should continue to be placed supine until 1 year of age…. Because rolling into soft bedding is an important risk factor for SUID after 3 months of age, parents and caregivers should continue to keep the infant's sleep environment clear of soft or loose bedding."

- "Infants should be placed on a firm sleep surface (eg, mattress in a safety-approved crib) covered by a fitted sheet with no other bedding or soft objects to reduce the risk of SIDS and suffocation."

- "Soft materials…should not be placed under a sleeping infant."

- "Sitting devices, such as car seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home, particularly for young infants..

- "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is safe and practical."

- "Avoid the use of commercial devices that are inconsistent with safe sleep recommendations."

- "Media and manufacturers should follow safe sleep guidelines in their messaging and advertising. Media exposures (including movie, television, magazines, newspapers, and Web sites), manufacturer advertisements, and store displays affect individual behavior by influencing beliefs and attitudes. Media and advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices. "

23.    The Rock 'n Play Sleeper does not allow the baby to sleep in a supine position as recommended by the 2005 AAP policy statement, and does not comply with the recommendation that "[s]oft materials…should not be placed under a sleeping infant.   A firm crib mattress, covered by a sheet, is the recommended sleeping surface."[11]   Defendants did not modify the design of the Rock 'n Play Sleeper even after the AAP issued its 2011 policy statement and 2016 updated policy statement expanding its recommendations that infants' heads should not be elevated, that sitting devices are not recommended for routine sleep, and that wedges and positioners should be avoided.

*Canada and Australia Refuse to Let Defendants Market the Product as a Sleeper*

24.    In January of 2011, the Australian Queensland Government Office of Fair Trading wrote to Defendants' Australian affiliate, informing them of their concern that Defendants' marketing of the Rock 'n Play Sleeper as a "sleeper" was contrary to accepted best practices that this type of product should not be used for

---

[11] http://pediatrics.aappublications.org/content/116/5/1245 (last visited April 10, 2019).

13

infant bedding.  It refused to permit Defendants to sell the product in Australia unless they removed all references to prolonged or overnight sleeping.  The agency was particularly concerned that a newborn using a Rock 'n Play Sleeper  could succumb to positional asphyxia.

25.    In February of 2011, Health Canada wrote to Defendants' affiliate in Canada expressing concerns that the Rock 'n Play Sleeper failed to comply with recommendations by Health Canada, the Public Health Agency of Canada and the Canadian Pediatric Society that babies sleep on a firm and flat surface.

26.    In March of 2011, Defendants' affiliate in Australia provided new box graphics to the Queensland Fair Trading Office eliminating references to sleeping and overnight and proposing to call the product a "Soother" instead of a "Sleeper." Rather than change their marketing, however, Defendants decided to withdraw the product from sale in Australia..

27.    According to Consumer Reports, the Rock 'n Play is available in Canada but is not called a "sleeper." Defendants market and sell it in Canada as the "Rock 'n Play Soothing Seat."

28.    Defendants, however, did not change the product's name in the United States, and continued to market the Rock 'n Play Sleeper as a sleeper as a "sleeper" for overnight use or prolonged sleep

***Other Warnings to Defendants About the Rock 'n Play Sleeper***

29.     Pediatricians have also warned Fisher Price about the dangers of the Rock 'n Play Sleeper.  In 2012, pediatrician Dr. Natasha Burgert wrote an open letter to Fisher-Price,[12] stating that:

*As a pediatrician and parent consumer, I believe it irresponsible to promote the Rock n' Play™ Sleeper as an [sic] safe, overnight sleeping option for infants. By continuing to do so, you are putting babies at risk.*

The Rock n' Play™ Sleeper should *not* be used for extended, unobserved infant sleep for the following reasons. First, design features of this product are known to increase the risk of sudden infant death syndrome (SIDS). Second, I have personally seen infants with brachycephaly/plagiocephaly and torticollis as a direct result of using this product. Finally, infants are often left with poor sleep habits that continue long beyond the product's use.

**1. The Rock n' Play™ Sleeper is not a safe place for overnight, unobserved infant sleep.**

The current American Academy of Pediatrics (AAP) guidelines for the prevention of SIDS includes placing baby on a firm sleep surface without extra padding, pillows, or loose items. The Rock and Play™ Sleeper does

---

[12] https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price

not adhere to these guidelines. Specifically, the bottom is not firm. And, some models include padded inserts that can move and shift during sleep. In my opinion, ***this product is a portable infant seat*** with attached sides, and should be categorized and marketed as such. I am concerned that infants in the "sleeper" may be at risk of asphyxiation or suffocation if continued to be used as a place for overnight, unobserved infant sleep.

**2. The Rock n' Play™ Sleeper puts infants at risk for deformities.**

When an infant is placed in a sleep environment as suggested by the AAP, infants are allowed natural body movements during sleep. They are able to freely move their head from side to side, and move their arms and legs to achieve different comfort positions throughout the night.

As a consequence to babies being restricted to one sleep position for multiple hours per day, infants using the Rock n' Play™ Sleeper are developing plagiocephaly/brachycephaly ("flat head") and torticollis. These are significant diagnoses potentially requiring expensive head-molding helmets and physical therapy.

My observational experience is not unique. There are currently numerous complaints online that should not be ignored. For example, one mother writes:

*We were finally referred to a specialist because we kept voicing our concerns with our pediatrician and it turns out our son was diagnosed with severe brachycephaly and moderate plagiocephaly. We are now getting him fitted for a $3,800 helmet that he'll have to wear 23 hrs each day. He also has torticollis, which is the tightening of the neck muscles, caused by the way he favored one side in the sleeper. He has to do daily stretches which he hates, but hopefully he won't need physical therapy. I truly believe that this sleeper caused these problems and I would NOT recommend this product to anyone...it's just not worth the risk.*

*-From Product Review on Amazon.com*

Frequent tummy time during waking hours, and holding babies in upright positions during play time, are not enough to counter the negative effects in head and body positioning that 16 hours a day in this product will produce.

Lying on a flat, firm surface is a better option for healthy development of our infants; and should be preferred to the physically restrictive, overnight sleep in the Rock n' Play™ Sleeper.

**3. The Rock n' Play™ Sleeper hinders the development of infant sleep habits.**

Learning good nighttime habits, including the ability to self-soothe, is a significant part of a child's growth and development. Patterns surrounding the sleep environment begin at *very early ages*. Specifically, foundational patterns of sleep-initiation, environmental experience, and nighttime expectations often begin to be established by *4 months of age.*

In my experience, parents who have used the Rock n' Play™ Sleeper face unexpected challenges once their baby outgrows this space. Families are suffering from many sleepless nights while their older infant re-learns how to sleep, on their backs, in their long-term sleep environment.

30.    Dr. Burgert's letter also stated:

The Rock n' Play™ Sleeper does not allow body movement to occur during sleep. The soft-bottomed "sleeper" cradles the infant during sleep and secures this position with an included restrictive safety harness. These design elements confine an infant in only one position for the entire duration of sleep (up to 16 hours a day).

31.    In 2013, pediatrician Dr. Roy Banoroch echoed Dr. Burgert's concerns in an email exchange with Defendant Fisher-Price.[13]   He wrote, for example, that "The Newborn Rock 'n Play Sleeper does not keep a baby wholly on the back, but

---

[13] https://pediatricinsider.wordpress.com/2013/04/29/the-fisher-price-rock-n-play-sleeper-is-not-for-sleeping/ (last visited April 10, 2019).

rather in an inclined position. It is not a safe way for babies to sleep." He noted that the AAP guidelines provide that "[s]itting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home," and advised Fisher Price that, "[t]hough this sentence doesn't specifically mention your product, the Newborn Rock 'n Play Sleeper is shaped like the devices in this category, and is therefore not recommended for sleep." Dr. Banoroch reported that a Fisher-Price representative responded, stating, "Thank you for your inquiry and comments. We did receive your email on February 7. 2013. We have provided these comments to the appropriate people within Fisher-Price. The Rock 'n Play Sleeper complies with all applicable standards."

***Infant Deaths and Injuries***

32.   In November 2018, in an article titled, "*Inclined sleepers like the Fisher-Price Rock 'n Play have been involved in at least 30 deaths reported to the Consumer Product Safety Commission since 2005*," The Wall Street Journal reported that "[t]he Consumer Product Safety Commission has received reports of at least 30 deaths and more than 700 injuries since 2005 in connection with these inclined sleepers,"

33.   The April 8, 2019 Consumer Reports article reported on an infant death in 2013 in the Rock 'n Play Sleeper:

> There is, for example, the mother in Hidalgo County, Texas, who placed her 2-month old daughter on her back

19

for a night's sleep on Oct. 19, 2013, according to a lawsuit filed by the family against Fisher-Price. At 4 a.m., when the mother checked, all was well, but by 7 a.m., the baby had stopped breathing. Her head was tilted to the side with her chin on her shoulder, compressing her airway. She was pronounced dead at the scene from positional asphyxia, or an inability to breathe caused by her position.[14]

34.     The Consumer Reports article also described a "close call" with another

infant in a Rock 'n Play Sleeper:

> [O]n July 25, 2014, a 7-week-old boy was placed in a Rock 'n Play Sleeper while his grandmother was in the room, according to a lawsuit filed against Fisher-Price that was ultimately dismissed.
>
> The grandmother, Jan Hinson, of Greenville, S.C., says she looked at her grandson and saw he was "cocked over all the way, and he was blue and lifeless. It was absolutely awful." She got the infant breathing again, and after a stay in the hospital, he was released.[15]

35.     The parent of an infant who died on January 6, 2018 made the following

report to the CPSC:[16]

> My 6 month old son was put down for a nap in the Fisher Price Rock n Play. During the time of his nap, he rolled over in the Rock N Play and silently died. The Rock N Play is sold as a sleeper and is marketed for "great overnight sleep". My son was 18 pounds well under the limit of 25 pounds that the Rock N Play provides as a weight limit for use. An average 9 month old boy is 25

---

[14] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited April 10, 2019).

[15] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited April 10, 2019).

[16] https://saferproducts.gov/ViewIncident/1728157?mod=article_inline (last visited April 10, 2019).

pounds, average for a girl is 12 months old at 25 pounds. Fisher Price has been notified of infant deaths due to their product and will still not recall it. This product can not be labeled as a sleeper or for "great overnight sleep". My son was a beautiful, healthy baby and only died because of the Rock N Play and the false sense of security they provide with their false and UNSAFE claims of the Rock N Play being used for safe sleep. The only place for safe sleep for an infant is a flat surface. This death trap needs to be recalled and labeled as a SUPERVISED PLAY PRODUCT so no other family has to lose their child like I have.

36.     In addition to deaths and close calls due to asphyxiation, parents have also reported their babies developing flat head and twisted neck (torticollis) syndrome. For example, one consumer posted on Amazon on March 16, 2018 that "This product is know[n] to give babies flat heads!! Just got out of the Cranial Technology office with our 4 mo. old who needs to wear a helmet. The Dr. said rock n plays keep them in business." (Emphasis supplied.) Fisher Price responded to this review, writing:

> We recommend everyone to speak with their pediatrician before using one of our Rock 'n Play Sleepers, to see if your baby is a good fit for it. We're very concerned about the situation you've described. One of our Consumer Services specialists would like to speak with you to get all the information we need to take action. Please call us as soon as possible at 1-888-253-4303, between the hours of 9:00 a.m. and 6:00 p.m. EST, Monday – Friday.

**The Reaction to Defendants' Belated Admission of Known Infant Deaths and Their "Warnings" to Consumers**

37.     As set forth above, on April 5, 2019, Fisher-Price and the CPSC issued a joint press release disclosing to the public the dangers of the Rock 'n Play Sleeper and warned consumers "about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product.[17]

38.     While the CPSC and Fisher-Price recommended that consumers stop using the Rock 'n Play when an infant reaches three months of age, or as soon as an infant exhibits rollover capabilities, as set forth above, the AAP recommends that inclined sleepers like the Rock 'n Play Sleeper should ***never*** be used for overnight or prolonged sleep for ***any*** infants, including newborns, whatever the age. Thus, after the announcement by CPSC and Fisher-Price, the AAP stated:

> We don't recommend that babies are placed to sleep with their heads elevated because that is a position that would be subject to accidental suffocation [and] strangulation in bed," said Feldman-Winter of the AAP. Instead, the AAP says that for prolonged or nighttime sleep, babies should be put on their backs, unrestrained, alone, on a flat, firm surface, such as a mattress covered by a fitted sheet in a bare crib, bassinet, or play yard.[18]

[17] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last visited April 10, 2019).

[18] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited April 10, 2019).

22

39.   Further, while the CPSC and Fisher-Price suggest that parents using the restraints on their babies when in the Rock 'n Play Sleeper renders the product safer, the AAP's advice is the opposite:

> [T]he American Academy of Pediatrics says it does not recommend products for routine sleep that require restraining a baby, especially if that product also rocks. "To [fasten] a baby down to a surface and then rock the baby is not consistent with our recommendations," said Lori Feldman-Winter, M.D., a member of the AAP task force on Sudden Infant Death Syndrome (SIDS) and a professor of pediatrics at Cooper Medical School of Rowan University in Camden, N.J.[19]

### Defendants' Deceptive Advertising and Marketing

40.   Notwithstanding the AAP's recommendations that babies sleep supine, that their heads not be elevated, that they sleep on a firm surface without soft materials, and that sitting devices such as car seats, strollers, swings, infant carriers and infant slings are not recommended for routine sleep, Defendants marketed the Rock 'n Play Sleeper as suitable for all night sleep for babies.

41.   Defendants deceptively advertise the Rock 'n Play Sleeper as suitable for overnight sleep for babies online and in-store.  Online advertising appears on the Fisher-Price website, where the product is available for purchase, as well as other

---

[19] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited April 10, 2019).

websites where the product is sold (such as Amazon.com). In-store advertising appears in the numerous stores where the Rock 'n Play Sleeper is sold.

42.   Defendants' deceptive advertising of the Rock 'n Play Sleeper starts with its very name: "*Sleeper*." By naming the product as a "Sleeper," Defendants mislead consumers into believing that the product is a safe and suitable place for babies to sleep. A reasonable consumer would assume the Rock 'n Play Sleeper's design is consistent with the applicable guidelines and recommendations about how babies should be safely placed to sleep.

43.   The principal means of in-store advertising is on the box in which the product is packaged. The boxes prominently touted that the product is suitable for all-night sleep and continued to do so even after the AAP 2011 and 2016 Policy Statements and expanded recommendations.

44.   The marketing statements on the packaging are inconsistent with the AAP's guidelines and recommendations. For example: Defendants' statements on the packaging that "Baby can sleep at a comfortable incline all night long!", "Comfortable incline for babies that need it", and "Incline or Recline – Choose the position that baby likes best," are contrary to the AAP's guidelines and recommendations that babies sleep supine and that their heads not be elevated.[20]

---

[20] A baby may prefer to be inclined or reclined, but sleeping in an inclined or reclined position is inconsistent with AAP recommendations because it increases the risk of suffocation.

45.   Defendants' statement on the packaging that "Extra-plush fabrics for extra-comfy sleep" is inconsistent with the AAP's guideline and recommendation that soft materials should not be placed under a sleeping infant.

46.   Defendants' statements on the packaging that the product is a "Nighttime sleeper and playtime seat!" and an "Adjustable seat for all-night sleep!" are inconsistent with the AAP's guideline and recommendation that sitting devices are not recommended for routine sleep.   Similar statements appeared on all of Defendants' packaging for the Rock 'n Play Sleeper at all relevant times.

47.   Defendants' marketing materials on its website are likewise inconsistent with the AAP's guidelines and recommendations, touting it as a "Nighttime sleeper and playtime seat in one!  This inclined sleeper rocks!  The supportive, angled seat back keeps baby elevated for playtime and inclined sleep (the way some babies sleep best!), to help baby sleep alllll [sic] night long."[21]

48.   Similar claims are made on other websites where the product is sold, including Amazon.com, where the product is described as "an inclined baby seat that helps little ones sleep all naptime or nighttime long," touting that it is "a Sleeper &

---

[21] https://fisher-price.mattel.com/shop/en-us/fp/moonlight-meadow-deluxe-newborn-rock-n-play-sleeper-chx77 (last visited April 10, 2019).

playtime seat in one", and saying that the parent and child "both could be sleeping in not time."[22]

49.    Defendants' deceptive marketing of the product as a "Sleeper" is a material factor in a consumer's decision to purchase the product. Had Defendants not marketed the product as a "Sleeper" suitable for overnight sleep, or had Defendants placed appropriate warnings on their marketing materials that using the product for overnight sleep was inconsistent with medical guidelines and recommendations because it increased the risk of death by asphyxia – that would likewise be a material factor in a consumer's decision whether to purchase the product.

50.    However, Defendants' deceptive marketing of the product as a "Sleeper" when it is inconsistent with the applicable medical guidelines and recommendations not only exposed purchasers' children to more risk than was represented, but also induced purchasers to pay a higher price than they would have otherwise paid for the product were it not so misleadingly advertised.

---

[22] https://www.amazon.com/Fisher-Price-Deluxe-Sleeper-Snugapuppy-Dreams/dp/B01LTHZ5SO/ref=sr_1_5_s_it?s=baby-products&ie=UTF8&qid=1523996652&sr=1-5&keywords=rock+n+play+sleeper (last visited April 10, 2019).

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Continuing Act Tolling*

51.    Beginning in 2009, Defendants continuously marketed and sold the dangerous Rock 'n Play Sleepers to unsuspecting parents and caregivers of infants. They continuously represented these inclined hammocks as safe environments for all night or prolonged infant sleep.   By making these false representations, and failing to disclose that the Rock 'n Play Sleepers were defectively designed and exposed infants to great risk of injury and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Defendants might seek to apply.

52.    Defendants' knowledge of the defects is evidenced by, inter alia: numerous complaints by consumers of injury and death (to some of which they responded); by warnings from the AAP and major consumer groups; by a lawsuit against them for an infant's death; and by Canada's and Australia's refusal to allow them to sell the device as a sleeper.

53.    Thus, Defendants had continuing knowledge of the dangers posed by the Rock 'n Play Sleepers, yet continued to market and sell them as safe environments for overnight and prolonged sleep. Plaintiff's and other Class members' claims are not time barred.

### *Fraudulent Concealment Tolling*

54.     Defendants had a duty to disclose to Plaintiff and the Class members the true quality and nature of the Rock 'n Play Sleepers, that the Rock 'n Play Sleepers had a uniform defect; and that the Rock 'n Play Sleepers pose a safety concern, and reduce the intrinsic and resale value of the vehicles.

55.     This duty arose, *inter alia*, under due to their overt representations that the Rock 'n Play Sleepers were safe for overnight use.

56.     Defendants have known at all relevant times of the risks that its Rock 'n Play Sleepers pose to infants.  Prior to selling them, Defendants knew or should have known about the AAP's 2005 recommendations concerning safe sleep, which state that babies should sleep flat on their back in an empty bassinet or crib.  Their bases for knowledge increased by 2011, when the AAP expanded on those warnings and when Canada and Australia prohibited them from selling them as "sleepers," and increased again over the following years as pediatricians wrote to them and they were sued due to an infant's death.

57.     Despite their knowledge of the defective design of the product, Defendants failed to disclose and concealed this material information from Plaintiff and other Class members, and instead continue to market the Rock 'n Play Sleepers as safe for overnight and prolonged infant sleep.

58.     The purpose of Defendants' concealment of the dangers was to prevent Plaintiff and other Class members from seeking redress.

59.     Plaintiff and the other Class members justifiably relied on Defendants to disclose the true nature of the products they purchased, because that defect was not discoverable by Plaintiff and the other Class members through reasonable efforts.

60.     Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

***Discovery Rule Tolling***

61.     Plaintiff and other Class members, through the exercise of reasonable diligence, could not have discovered Defendants' wrongdoing, prior to the Wall Street Journal's November 2018 article concerning the many deaths and injuries that occurred due to the use of inclined sleepers including the Rock 'n Play Sleepers, that Defendants were concealing and misrepresenting dangerous defects in the Rock 'n Play Sleepers and the risks that were posed by those defects.

62.     Plaintiff and the other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Defendants knowingly failed to disclose material information within its knowledge about a dangerous defect to consumers worldwide.

63.     As such, no potentially relevant statute of limitations should be applied.

*Estoppel*

64.     Defendants were under a continuous duty to disclose to Plaintiff and the other members of the Class to disclose the facts that it knew about the dangerously defective design of the Rock 'n Play Sleepers.

65.     Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Rock 'n Play Sleepers from Plaintiff and other members of the Class.

66.     Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this class action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and on behalf of a nationwide class (the "Nationwide Class") defined as:

All persons who purchased a Fisher-Price Rock 'n Play Sleeper in the United States from January 1, 2009 to the present.

68.     Plaintiff also seeks certification of a class of New Jersey purchasers (the "New Jersey Class") defined as:

All persons who purchased a Fisher-Price Rock 'n Play Sleeper in New Jersey from January 1, 2009 to the present.

69.    Excluded from the Nationwide Class and the New Jersey Class (together, the "Class") are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

70.    Certification of Plaintiff's claims for Class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71.    ***Numerosity—Federal Rule of Civil Procedure 23(a)(1).*** The members of the Class are so numerous that joinder of all Class members would be impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the Class contains many thousands of members. The precise number of Class members is unknown to Plaintiff.

72.    ***Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).*** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.      Whether Defendants' claims about the Rock 'n Play Sleeper set forth above being suitable for prolonged or overnight sleep are reasonably likely to deceive.

b.      Whether Defendants engaged in unfair and/or deceptive advertising in marketing the product as a "Sleeper" that was suitable for prolonged or overnight sleep.

c.      Whether Defendants' misconduct constitutes a breach of the express warranty that exists between Defendants and Plaintiff and the other members of the Class.

d.      Whether Defendants have been unjustly enriched.

e.      Whether Defendants engaged in deceptive advertising.

f.      Whether Plaintiff and the members of the Class have been injured by Defendants' misconduct.

g.      Whether Plaintiff and the members of the Class are entitled to relief, and the amount and nature of such relief.

73.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and other Class members. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both

quality and quantity, to the numerous common questions that predominate in this action.

74.     *Typicality – Federal Rule of Civil Procedure 23(a)(3).*   Plaintiff's claims are typical of the claims of the other members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above, and all Class members were subject to Defendants' deceptive statements, including deceptive claims that accompanied each and every Rock 'n Play Sleeper that was sold concerning its suitability for prolonged or overnight sleep. Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

75.     *Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).* Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

76.     *Insufficiency of Separate Actions—Federal Rule of Civil Procedure 23(b)(2).*   Fisher-Price has acted in a manner that applies generally to the Class, so that relief is appropriate respecting the Class as a whole. The Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(2).

77.     *Superiority—Federal Rule of Civil Procedure 23(b)(3).*   A class action is superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## <u>COUNT I</u>

**BREACH OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. 56:8-1, *et seq.***
**(On Behalf of the New Jersey Class)**

78.     Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

79.     The New Jersey Consumer Fraud Act ("NJ CFA") clearly applies to all sales of Rock 'n Play Sleepers in New Jersey.

80.    The NJ CFA was enacted to protect consumers against sharp and unconscionable commercial practices by persons engaged in the sale of goods or services. *See Marascio v. Campanella*, 298 N.J. Super. 491, 500 (App. Div. 1997).

81.    The NJ CFA is a remedial statute which the New Jersey Supreme Court has repeatedly held must be construed liberally in favor of the consumer to accomplish its deterrent and protective purposes.  *See Furst v. Einstein Moomjy*, 182 N.J. 1, 11-12 (2004) ("The Consumer Fraud Act is remedial legislation that we construe liberally to accomplish its broad purpose of safeguarding the public.").

82.    With regard to the NJ CFA, "[t]he available legislative history demonstrates that the Act was intended to be one of the strongest consumer protection laws in the nation." *New Mea Const. Corp. v. Harper*, 203 N.J. Super. 315, 319 (App. Div. 1986).

83.    For this reason, the "history of the Act is one of constant expansion of consumer protection."  *Kavky v. Herballife Int'l of Am.*, 359 N.J. Super. 497, 504 (App. Div. 2003).

84.    N.J.S.A. 56:8-2 of the NJ CFA prohibits "unlawful practices," which are defined as:

> The act, use or employment of any unconscionable commercial practice, deception, fraud, false pretense, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission whether or not any person has in fact been misled, deceived or damaged thereby.

85.    Rock 'n Play Sleepers are "credence good[s]," because their properties and purported benefits cannot be independently assessed or verified by the consumer at the time of purchase and such properties and benefits are made known to consumers only through the information provided on the labels by the products' manufacturer and distributor. *See Lee v. Carter-Reed Co., L.L.C.*, 203 N.J. 496, 522 (2010).

86.    The New Jersey Supreme Court in *Lee*, 203 N.J. at 522, spoke regarding the relationship between dishonest product labeling and credence goods, stating: "A rational consumer does not randomly take a bottle of pills off a shelf and then purchase it without reading the packaging and labeling."

87.    In order to state a cause of action under the NJ CFA, a plaintiff does not need to show reliance by the consumer. *See Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 43, 752 A.2d 807 (App. Div. 2000); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607-608, 691 A.2d 350 (1997) (holding that reliance is not required in suits under the NJ CFA because liability results from "misrepresentations whether 'any person has in fact been misled, deceived or damaged thereby'").

88.    Rather, the NJ CFA requires merely a causal nexus between the false statement and the purchase, not actual reliance. *See Lee*, 203 N.J. at 522 ("It bears repeating that the CFA does not require proof of reliance, but only a causal connection between the unlawful practice and ascertainable loss.").

89.     The purchase of a credence good, where the label on the product contains misrepresentations of material fact, by itself, establishes a presumption of a causal nexus under the NJ CFA. *See Lee*, 203 N.J. 496.

90.     By the acts alleged herein, Defendants have violated the NJ CFA.

91.     Specifically, Defendants have made identical, false, written misstatements of affirmative fact to Plaintiff and each class member on the box of and in the marketing for each Rock & Play Sleeper sold in New Jersey, as previously described in detail herein – *i.e.*, that the products were "sleepers," safe for overnight or prolonged sleep.

92.     These statements were false when made and Defendants knew that these statements were false when made.

93.     As a result of these false, written, affirmative misstatements of material fact, Plaintiff and each class member has suffered an ascertainable loss.

94.     Specifically, Plaintiff and each class member have been deprived of the benefit of the promised bargain – a valid measure of "ascertainable loss" under the NJ CFA according to the New Jersey Supreme Court and New Jersey Appellate Division – in that Plaintiff and each class member received something less than what was represented by Defendants on their products' boxes and in their other marketing.

## COUNT II

### NEW JERSEY TRUTH IN CONSUMER CONTRACT, WARRANTY
### AND NOTICE ACT N.J.S.A. 56:12-14, *et seq.*
### (On Behalf of the New Jersey Class)

95.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

96.    Plaintiff and each the class member are "consumers" within the meaning of N.J.S.A. 56:12-15 and 16.

97.    Defendants are "sellers" within the meaning of N.J.S.A. 56:12-15 and 16.

98.    The boxes in which the Rock 'n Play Sleeper are sold as well as other marketing by Defendants for the Rock 'n Play Sleepers as described herein constitute both a consumer "notice" and "warranty" within the meaning of N.J.S.A. 56:12-15 and 16.

99.    By the acts alleged in detail herein, Defendants have violated N.J.S.A. 56:12-15 and 16 because, in the course of Defendants' business, Defendants have displayed and/or offered written consumer notices and warranties to Plaintiff and each class member that contained provisions which violated their clearly established legal rights under New Jersey state law, within the meaning of N.J.S.A. 56:12-15 and 16.

100.  Specifically, the clearly established rights of Plaintiff and the class

under state law include the right not to be subjected to unconscionable commercial practices and false written affirmative statements of fact in the sale of goods, as described herein, which acts are prohibited by the CFA, *N.J.S.A.* § 56:8-2.

101.   Pursuant to N.J.S.A. 56:12-17, this class complaint seeks a statutory penalty of $100 for each class member, as well as actual damages and attorney's fees and costs.   *See N.J.S.A.* § 56:12-17, providing that a seller who violates the TCCWNA: "shall be liable to the aggrieved consumer for a civil penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs."   *See also United Consumer Fin. Servs. Co. v. Carbo*, 410 N.J. Super. 280, 310 (App. Div. 2009), affirming trial judge's decision to award the $100 statutory penalty to each class member under *N.J.S.A.* § 56:12-17 of TCCWNA, stating:

> [T]he $100 civil penalty is not unreasonably disproportionate when viewed in that context, whether it is considered with respect to an individual consumer or the 16,845 consumers whose contracts included the prohibited fee. We note that when assessing the constitutional reasonableness of punitive damage awards, courts are directed to consider and give 'substantial deference' to judgments made by the Legislature in fixing civil penalties. Nothing about the facts of this case or the numerosity of this class warrants a more searching evaluation of the reasonableness of awarding the civil penalty selected by the Legislature to each member of this class.

(internal citations omitted).

## COUNT III

### BREACH OF WARRANTY
### (On Behalf of the New Jersey Class)

102.  Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

103.  Defendants sold the Rock 'n Play Sleepers in their regular course of business.  Plaintiff and the class members purchased Rock 'n Play Sleepers.

104.  Defendants made promises and representations in an express warranty provided to all consumers, namely that Rock 'n Play Sleepers were appropriate for prolonged or overnight sleep, which became the basis of the bargain between Defendants and Plaintiff and each class member.

105.  Defendants gave these express warranties to Plaintiff and each class member in written form on the packaging of Rock 'n Play Sleepers as well as the other marketing described herein.

106.  Defendants' written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty.

107.  Defendants breached their express warranty because the uniform written statements on each box containing a Rock 'n Play Sleeper, as well as the other marketing described herein, claiming that they were appropriate for prolonged or overnight sleep, is false, and Rock 'n Play Sleeper did not contain the properties Defendants represented.  Defendants breached the warranty because, contrary to

their representations, the product is not suitable for infants to sleep for prolonged periods or overnight because it fails to comply with the applicable medical guidelines and recommendations concerning safe sleep for infants.

108.   The false information provided was false when the sale took place and was undiscoverable to Plaintiff and the class members at the time of purchase.

109.   Defendants knew that their representations were false because they was aware of the AAP's guidelines and recommendations concerning safe sleep for infants as well as the refusal of Australian and Canadian regulators to allow the sale of the product as a "Sleeper" in Australia and Canada.

110.   In addition, by placing Rock 'n Play Sleeper in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and class members that the product was accurately labeled in conformance with the law.

111.   Defendants have refused to adequately remedy their breaches of warranty.

112.   Defendants' breaches of express and implied warranty caused Plaintiff and the Class members to suffer injuries, paying for falsely labeled products, and entering into transactions they would not have entered into for the consideration paid. As a direct and proximate result of Defendants' breaches of warranty, Plaintiff and the other Class members have suffered damages and continue to suffer damages,

including economic damages consisting of the difference between the value of a product suitable for infants to sleep in overnight, and the value of the Rock 'n Play Sleeper as delivered and compensation for exposing their baby to child(ren) to the risk of positional asphyxia as a result of using the Rock 'n Play Sleeper.  Plaintiff and the Class do not seek damages for any personal injuries that may have occurred as a result of using this product.

113.   As a result of the breach of these warranties, Plaintiff and the Class members are entitled to legal and equitable relief including  damages, costs, attorneys' fees, rescission, and/or other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

## COUNT IV
### BREACH OF IMPLIED CONTRACT THROUGH VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of the New Jersey Class)

114.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs.

115.   This claim is asserted on behalf of Plaintiff and the New Jersey Class. By operation of law, there existed an implied contract for the sale of Rock 'n Play Sleeper between Defendants and Plaintiff and each class member who purchased either product.

116.   By operation of law, there existed an implied duty of good faith and fair dealing in each such contract.

117.   By the acts alleged herein, Defendants have violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendants and each class member.

118.   As a result of that breach, Plaintiff and each class member suffered damages.

## COUNT V
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, *et seq.*
## (On Behalf of the Nationwide Class)

119.   Plaintiff repeats and realleges the allegations contained in in all preceding paragraphs, as if fully set forth herein.

120.   The sale of the Rock 'n Play Sleepers was subject to the provisions and regulations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

121.   The Rock 'n Play Sleepers are "consumer products" as defined in the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

122.   Plaintiff and the other Nationwide Class members are "consumers" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

123.   Defendants are "suppliers" and "warrantors" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

124.   The express warranties in Defendants' marketing and advertising provided by Defendants are "written warranties" as defined in the Magnuson-Moss

Warranty Act, 15 U.S.C. § 2301(6). The Rock 'n Play Sleepers' implied warranties are come under 15 U.S.C. § 2301(7).

125. Defendants breached these warranties, as further described above, by selling the Rock 'n Play Sleepers as "Sleepers," and not disclosing their defective condition, and by providing Rock 'n Play Sleepers not in merchantable condition and not fit for the ordinary purpose for which baby sleepers are used. They are also not fit for the specific purposes for which Defendants sold them to Class members and for which Class members purchased them.

126. Privity is not required in this case because Plaintiff and the other Nationwide Class members are intended third-party beneficiaries of contracts between Defendants and those who sell its products; specifically, they are the intended beneficiaries of Defendants' express and implied warranties. The vendors were not intended to be the ultimate consumers of the Rock 'n Play Sleepers and have no rights under the warranty agreements provided with the Rock 'n Play Sleepers; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because the Rock 'n Play Sleepers are dangerous instrumentalities due to the aforementioned defects and nonconformities.

127. Requiring an informal dispute settlement procedure, or affording Defendants a reasonable opportunity to cure its breach of written warranties, is

unnecessary and futile. At the time of sale or lease of each Rock 'n Play, Defendants knew, should have known, or was reckless in not knowing, of its misrepresentations concerning the Rock 'n Play Sleepers' inability to provide a safe sleeping environment, but nonetheless failed to rectify the situation and/or disclose the truth. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

128.   Plaintiff and the other members of the Nationwide Class would suffer economic hardship if they returned their Rock 'n Play Sleepers but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Nationwide Class members have not re-accepted its Rock 'n Play Sleepers by retaining them.

129.   Plaintiff and the other Nationwide Class members have been damaged as a result of the wrongful conduct complained of herein. Said conduct continues and the harm or risk of harm is ongoing.

130.   The amount in controversy exceeds the statutory minimums set forth at 15 U.S.C. § 2310(d)(3). Each Plaintiff's individual claim is equal to or larger than

$25 and the cumulative amount in controversy (excluding interest and costs) exceeds $50,000.

131.   As a result of Defendants' violations of the Magnuson-Moss Warranty Act and its express and implied warranties with consumers, Plaintiff and the other members of the Nationwide Class have been damaged in an amount to be determined at trial.

## COUNT VI

### UNJUST ENRICHMENT/QUASI-CONTRACT/DISGORGEMENT/RESTITUTION
**(On Behalf of the Nationwide Class and the New Jersey Class)**

132.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

133.   Plaintiff pleads this claim for relief in the alternative to the contract claims set forth above.

134.   Plaintiff and the class members have conferred substantial benefits on Defendants by purchasing Rock 'n Play Sleeper, and Defendants have knowingly and willingly accepted and enjoyed these benefits.

135.   Defendants either knew or should have known that the payments rendered by Plaintiff and the class members were given and received with the

expectation that the product would be as represented and warranted. For Defendants to retain the benefit of the payments under these circumstances is inequitable.

136.   Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of Defendants' Rock 'n Play Sleeper, including representing that the products had that they were appropriate for prolonged or overnight sleep, Defendants each reaped benefits, which resulted in each Defendant wrongfully receiving profits.

137.   Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless Defendants are ordered to disgorge those profits for the benefit of Plaintiff and the class members.

138.   As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff and the class members are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants through this inequitable conduct.

139.   Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of its deceptive marketing and advertising practices. Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief against Defendants as set forth below:

1.     Certifying the proposed Nationwide Class and the New Jersey Class;

2.     Appointing Plaintiff as Class representative and her undersigned counsel as Class counsel;

3.     Awarding Plaintiff and the proposed Class members damages;

4.     Awarding punitive damages to the extent permitted under law;

5.     Awarding restitution and disgorgement of Defendants' revenues to Plaintiff and the proposed Class members;

6.     Awarding declaratory relief as permitted by equity, including directing Defendants to identify, with Court supervision, the victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be unlawful;

7.     Ordering Defendants to issue a recall for the product;

8.     Ordering Defendants to change the statements on the product's packaging and disclosures/warnings;

9.     Ordering Defendants to engage in a corrective advertising campaign;

10.     Awarding attorneys' fees and costs; and

11.    Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial on all issues so triable.

Dated:      April 11, 2018

**Denittis Osefchen Prince, PC**

by: _____

Stephen P. DeNittis SD-0016
Joseph Osefchen
Shane T. Prince
5 Greentree Centre
525 Route 73 North, Suite 410
Marlton, NJ 08053
Telephone: 856-797-9951
Fax: 856-797-9978
Email: sdenittis@denittislaw.com

*Attorneys for Plaintiff and the*
*Proposed Class*

**Forchelli Deegan Terrana**
**A Limited Liability Partnership**
Elbert F. Nasis
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
Telephone: 516-248-1700
Fax: 866-644-6119
E-Mail: ENasis@ForchelliLaw.com

*Additional Counsel for Plaintiff*

*CERTIFICATION PURSUANT TO N.J.S.A. 56:8-1 et seq.*

The undersigned hereby certify that a copy of this complaint has been

forwarded to  the Attorney General of the State of New Jersey.

**DeNITTIS OSEFCHEN PRINCE, P.C.**

BY: _____
    Stephen P. DeNittis, Esq. SD 0016
    5 Greentree Centre
    525 Route 73 North, Suite 410
    Marlton, NJ 08053
    Tel.:  (856) 797-9951
    Fax:  (856) 797-9978

Dated:  April 11, 2019                    *Attorneys for Plaintiff and the*
                                          *Proposed Class*

50